1
2
3
4
5
6
7
8               UNITED STATES DISTRICT COURT
9             SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11  ABBVIE INC., a Delaware corporation, | Case No.: 23-CV-2290 TWR (DEB) |
| 12                              Plaintiff, | **ORDER (1) DENYING MOTION** |
| 13  v. | **TO COMPEL ARBITRATION,** |
| | **(2) DENYING AS MOOT** |
| 14  ADCENTRX THERAPEUTICS INC., | **MOTIONS TO STAY, AND** |
| 15  a Delaware corporation; DONG JUN | **(3) DENYING MOTIONS TO** |
|     (Danny) LEE, an individual; and DOES | **DISMISS** |
| 16  1–10, | |
| 17                             Defendants. | (ECF Nos. 32, 33) |
| 18 | |

19        Presently before the Court are the Motion to Stay Pending Arbitration of Claims

20  Against Dr. Lee, or Alternative Motion to Dismiss ("Adcentrx Mot.," ECF No. 32) filed

21  by Defendant Adcentrx Therapeutics Inc. ("Adcentrx") and Motion to Compel Arbitration

22  and Stay Proceedings or, in the Alternative, to Dismiss the First Amended Complaint ("Lee

23  Mot.," ECF No. 33) (together, the "Mots.") filed by Defendant Dong Jun (Danny) Lee, as

24  well as the Opposition ("Opp'n," ECF No. 35) filed by Plaintiff AbbVie, Inc. ("AbbVie")

25  and Defendants' joint Reply ("Reply," ECF No. 36).   The Court held a hearing on

26  December 19, 2024.  (*See generally* ECF No. 37; *see also* ECF No. 38 ("Tr.").)   Upon

27  consideration of the Parties' arguments, Plaintiff's First Amended Complaint ("FAC," ECF

28  No. 29), the record, and the applicable law, the Court **DENIES** Dr. Lee's Motion to compel

AbbVie to arbitration, **DENIES AS MOOT** Dr. Lee's and Adcentrx's Motions to stay pending arbitration of AbbVie's claims against Dr. Lee, and **DENIES** Dr. Lee's and Adcentrx's Motions to dismiss.

BACKGROUND

## I.    Factual Background[1]

### A.    AbbVie

"AbbVie is a global biopharmaceutical company headquartered in North Chicago, Illinois." (FAC ¶ 28.) "AbbVie was formed as an independent company in 2013, following its separation from Abbott Laboratories." (*Id.*)

"In 2015, AbbVie began the MTi (microtubule inhibitor) [antibody drug conjugate ("ADC")] program [(the "MTi ADC program")], which focused on developing new ADCs that incorporated microtubule inhibitors ("MTi") as anti-cancer payloads/linker-drugs." (*Id.* ¶ 31.) "Unlike conventional chemotherapy, ADCs are targeted medicines that selectively deliver anti-cancer payloads directly to cancer cells." (*Id.* ¶ 30.) "ADCs comprise (i) a monoclonal antibody that binds to a specific target (antigen) on the surface of a cancer cell, plus (ii) an anti-cancer payload which is attached (conjugated) to the antibody through (iii) a chemical linker." (*Id.*) "The combination of the anti-cancer payload and the linker is typically referred to as a 'linker-drug.'" (*Id.* ¶ 2.)

"AbbVie's MTi ADC program aimed to improve upon clinical stage and FDA-approved MTi ADC products such as ADCETRIS®." (*Id.* ¶ 31.) "These clinical stage and FDA-approved products were predominantly based on the monomethyl auristatin E

---

[1]    For purposes of Defendants' motions to dismiss, the Court "must accept as true all material allegations in the complaint, as well as any reasonable inferences to be drawn from them," and construe AbbVie's First Amended Complaint "in the light most favorable to the plaintiff." *See Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003). In resolving Dr. Lee's motion to compel arbitration, however, "district courts rely on the summary judgment standard of Rule 56 of the Federal Rules of Civil Procedure." *See Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021). Accordingly, "the Court will consider the substance of evidence that would be admissible at trial." *See S.S. ex rel. Stern v. Peloton Interactive, Inc.*, 566 F. Supp. 3d 1019, 1044 (S.D. Cal. 2021) (citing *Dinkins v. Schinzel*, 362 F. Supp. 3d 916, 922-23 (D. Nev. 2019)).

("MMAE") platform developed by Seattle Genetics ("SeaGen")." (*Id.*) "AbbVie's MTi ADC program sought to develop novel payload designs and novel linker-drug designs not based on the MMAE platform, to create highly effective, novel MTi ADCs." (*Id.*)

In May 2015, AbbVie acquired Pharmacyclics, Inc., thereby becoming Pharmacyclics LLC ("PCYC"), a wholly owned subsidiary of AbbVie. (*See* ECF No. 32-1 ("Lee Decl.") ¶ 5; ECF No. 32-2 ("Ex. 1").)

### B.      *Dr. Lee's Employment with AbbVie*

"AbbVie hired Lee as an ADC Chemist/Senior Scientist in February of 2015." (FAC ¶ 32). "As a condition of his employment with AbbVie, on February 2, 2015, Lee and AbbVie executed an Employment Agreement." (*Id.* ¶ 146; *see also generally* ECF No. 29-5 ("Ex. E").) This Employment Agreement included certain Inventions Assignment Provisions providing that AbbVie owned all of Dr. Lee's inventions during his employment with AbbVie, (*see* FAC ¶¶ 149–51, 153, 204, 205; Ex. E ¶¶ 3–5), and Confidentiality Provisions prohibiting Dr. Lee from disclosing or using AbbVie's confidential information for any purposes outside his employment with AbbVie. (*See* FAC ¶¶ 149, 152, 154, 215, 216; Ex. E ¶¶ 2, 3, 8.)

"Beginning in or around the fall of 2015, Lee worked on a team of chemists who designed and synthesized payloads that were part of AbbVie's MTi ADC program." (FAC ¶ 32.) "Thereafter, Lee quickly established himself as one of the key scientists in AbbVie's MTi ADC program, where Lee dedicated the bulk of his time from late 2015 until he left for PCYC in January 2019." (*Id.*)

Dr. "Lee's role in AbbVie's MTi ADC program was primarily to design, synthesize, and evaluate AbbVie proprietary payload and linker-drug designs." (*Id.* ¶ 33.) Dr. "Lee tracked the payloads he designed and synthesized by using his initials: DJL (for Dong Jun Lee)," *i.e.*, Dr. "Lee designated the first payload he designed and synthesized while employed at AbbVie as DJL-1, the second as DJL-2, and so on." (*See id.* (emphasis in original).)

/ / /

23-CV-2290 TWR (DEB)

Of particular significance to the instant action are payload designs DLJ-43 (also referred to as ABBV-1), which Dr. Lee synthesized on November 8, 2016, and DLJ-51, which Dr. Lee synthesized no later than January 4, 2017.  (*See id.* ¶¶ 48, 49.)  The structural formulas of DJL-43/ABBV-1 and DLJ-51/ABBV-2 are depicted below:



(*See id.* ¶ 45.)  "ABBV-1 has (i) an ortho-oriented anilino moiety at the C-terminus [green box], and (ii) a tertiary amine-based hydrophilic moiety at the N-terminus [blue box]."  (*Id.* ¶ 46.)  "ABBV-2 has a (i) meta-oriented anilino moiety at the C-terminus [orange box], and (ii) a tertiary amine-based hydrophilic moiety at the N-terminus [blue box]."  (*Id.*) "These compounds and their designs—including the orientation of the structural components at the C- and N-terminus—are among the AbbVie payload trade secret information."  (*Id.* ¶ 47.)  "Documents created by Lee describing his work on DJL-43 and DJL-51 characterize these MTi-ADC payloads as 'novel.'"  (*Id.* ¶ 50.)

## C.    Dr. Lee's Employment with Pharmacyclics LLC

"In the second half of 2018, [Dr. Lee] became interested in potentially moving to California."  (Lee Decl. ¶ 8.)  Dr. Lee therefore explored the option of transferring from AbbVie, in Chicago, to PCYC, in Sunnyvale, (*see id.* ¶ 9), and "communicated [his] desire to relocate [to California] via an internal transfer to [his] mentor Dr. Anthony Haight and to [his] manager Dr. Dennie Welch at AbbVie."  (*See id.* ¶ 11.)

"On or around September 25, 2018, Dr. Jeff Zablocki, the recently appointed head of medicinal chemistry at PCYC, visited the AbbVie Lake County facility . . . for an

oncology portfolio review." (*See id.* ¶ 10.)  Dr. Lee "met with Dr. Zablocki and told him that [he] was interested in a potential transfer to the PCYC Sunnyvale office, and Dr. Zablocki communicated to [Dr. Lee] that he was amenable to that idea and that he would look into it further." (*See id.*)

On October 2, 2018, Dr. Lee received an email regarding his "interviews for the Senior Scientist II position scheduled for Thursday, October 11[,] beginning at 09:00 AM" from Lavanya Dinesh Kumar, a "Talent Acquisition Coordinator" for "Pharmacyclics LLC, An AbbVie Company." (*See* ECF No. 33-5 ("Ex. 4") at 4.)  On October 19, 2018, Dr. Lee received an email from Scott Richter, the "Principal Recruiter" for PCYC, with "great news!," namely, that he was "beginning to work on putting together an offer for [Dr. Lee] to joint Pharmacyclics," and asking to set up a "brief discussion around relocation." (*See id.* at 1.)

Mr. Richter emailed Dr. Lee an "offer to join Pharmacyclics, an AbbVie Company," on October 25, 2018.  (*See* ECF No. 33-6 ("Ex. 5"); *see also* Lee Decl. ¶ 13.)  The email transmitted several attachments, including a transfer offer letter, (*see* ECF No. 33-7 ("Ex. 6"); a copy of the "AbbVie Relocation Handbook HC Plan 1," dated January 2018, (*see* ECF No. 33-8 ("Ex. 7")); a document entitled "Fact Sheet: Transitioning to AbbVie's Retirement Benefits," (*see* ECF No. 33-9 ("Ex. 8")); a document entitled "AbbVie – total rewards highlights: an overview of benefits, compensation and well-being resources for employees of Pharmacyclics, an AbbVie Company," (*see* ECF No. 33-10 ("Ex. 9")); and a "Mutual Arbitration Agreement," (*see* ECF No. 33-11 ("Ex. 10" or "Arbitration Agreement")).  (*See* Lee Decl. ¶¶ 13–18.)

The Arbitration Agreement was printed on letterhead displaying the following image in the upper righthand corner of each page:



(*See generally* Ex. 10.)  In relevant part, the Arbitration Agreement provides:

In consideration of the binding mutual agreement to arbitrate claims as set forth herein ("Arbitration Agreement"), the mutual waiver of rights set forth herein, the undersigned Employee's ("Employee") employment (if not currently employed), or Employee's continued employment (if Employee is currently employed), Employee and Employer agree that, except as otherwise provided in this Arbitration Agreement, any existing, currently pending and/or future claim (except a claim that by law is non-arbitrable) that has arisen or arises between Employee, any third-party for which Employee pursues a claim, including but not limited to an individual, entity, and/or a state or federal agency ("Employee Parties"), and the Company, its past, present, and future: parent(s), subsidiaries, affiliates, and/or their respective past, present, and future: officers, directors and/or employees ("Employer Parties"), including but not limited to claims arising from and/or relating in any way to Employee's hiring, Employee's employment with, and/or the severance of Employee's employment with the Company, shall be resolved by final and binding arbitration before a single, neutral arbitrator as the exclusive remedy, to the full extent permitted by law. Employee hereby covenants not to file a lawsuit against Employer Parties and Employer hereby covenants not to file a lawsuit against Employee Parties in contravention of this Arbitration Agreement.

(*See id.* § I.) In their briefing, the Parties distinguish between the first sentence as the "Arbitration Clause" and the second as the "Covenant Not to Sue." (*See generally* Adcentrx Mot.; Lee Mot.; Opp'n; Reply.)

Dr. Lee signed the offer letter on October 26, 2018, (*see* ECF No. 33-12 ("Ex. 11")), and the Relocation Handbook and Arbitration Agreement on October 29, 2018, (*see* ECF Nos. 33-13 ("Ex. 12") and 33-14 ("Ex. 13"), respectively. (*See* Lee Decl. ¶¶ 19–21.)

On January 8, 2019, Dr. Lee filled out an "Application for Employment" with "Pharmacyclics, An AbbVie Company." (*See* ECF No. 33-15 ("Ex. 14"); *see also* Lee Decl. ¶ 24.) Dr. Lee listed his "Most Recent Employer" as "AbbVie" and, under "Reason For Leaving," wrote "[i]nternal transfer." (*See* Ex. 14 at 2.) Consistent with the offer letter, which informed Dr. Lee that he "w[ould] remain on AbbVie payroll and benefits programs until such time that AbbVie and PCYC payroll and benefits administration systems are integrated," (*see* Ex. 6 at 1), Dr. Lee's 2019 W-2 indicated that his employer was "AbbVie, Inc." (*See* ECF No. 33-16 ("Ex. 15").)

### D.      Dr. Lee's Employment with Adcentrx

In April 2021, while still employed by PCYC, Dr. Lee accepted a position with Defendant Adcentrx, which had been founded five months earlier.  (FAC ¶¶ 3, 99, 100.) Dr. "Lee stayed on at PCYC for an additional two months, until June 2021, planning for his departure to Adcentrx."  (*Id.* ¶ 99.)  Dr. "Lee resigned from PCYC in June 2021."  (*Id.*)

"Upon joining Adcentrx, Lee used and disclosed AbbVie's trade secret and confidential information, including but not limited to AbbVie's payload trade secret designs ABBV-1, ABBV-2, AbbVie's linker-drug trade secret design, AbbVie's ADC trade secrets, and AbbVie's method and scientific information trade secrets to his new employer."  (*Id.* ¶ 101.)  "Within approximately four months of Lee joining a five-month-old company, Adcentrx began filing a series of patent applications, naming Lee as an inventor, disclosing AbbVie's trade secrets and confidential information, an impossibly fast timeframe for independent invention of the subject matter."  (*Id.* ¶ 102.)

## II.     Procedural Background

AbbVie initiated this action on December 15, 2023, alleging four causes of action for (1) misappropriation of trade secrets under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, against both Adcentrx and Dr. Lee; (2) declaratory judgment against Adcentrx and Dr. Lee; (3) breach of the Inventions Assignment Provisions of the Employment Agreement against Dr. Lee; and (4) breach of the Confidentiality Provisions of the Employment Agreement against Dr. Lee.  (*See generally* ECF No. 1.)

On January 22, 2024, Dr. Lee moved to compel AbbVie's claims against him to arbitration and stay these proceedings pending arbitration or, alternatively, to dismiss AbbVie's initial complaint, (*see generally* ECF No. 14), and Adcentrx moved to stay pending arbitration of AbbVie's claims against Dr. Lee or, alternatively, to dismiss.  (*See generally* ECF No. 15.)  The Honorable Roger T. Benitez took the motions under submission without oral argument, (*see* ECF No. 26), and, on July 29, 2024, granted in part and denied in part the motions.  (*See generally* ECF No. 27 (the "Prior Order").)  Specifically, Judge Benitez denied Dr. Lee's motion to compel arbitration, denied as moot

Dr. Lee's and Adcentrx's motions to stay, and granted Defendants' motions to dismiss. (*See generally id.*)

After this action was transferred to the undersigned on August 1, 2024, (*see* ECF No. 28), AbbVie filed the operative First Amended Complaint. (*See generally* ECF No. 29.) The instant Motions followed on September 10, 2024. (*See generally* ECF Nos. 32 & 33.)

## DR. LEE'S MOTION TO COMPEL ARBITRATION

## I. Legal Standard

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, governs arbitration agreements in any contract affecting interstate commerce, including those found in employment contracts. *See Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 119, (2001); *see also* 9 U.S.C. § 2. The FAA "provides that 'an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1193 (9th Cir. 2024) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)).

Courts review arbitration agreements in light of the "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *Soto v. Am. Honda Motor Co.*, 946 F. Supp. 2d 949, 953–54 (N.D. Cal. 2012). "If a party ignores its agreement to arbitrate, the other party may ask a court to issue 'an order directing that such arbitration proceed in the manner provided for in such agreement.'" *Fli-Lo Falcon*, 97 F.4th 1190 at 1194 (quoting 9 U.S.C. § 4). Further, "[i]f an agreement exists, the FAA 'leaves no place for the exercise of discretion by a district court, but instead mandates that [it] shall direct the parties to proceed to arbitration.'" *Id*. at 1193 (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)).

/ / /

/ / /

## II.  Analysis

Dr. Lee seeks to compel to arbitration AbbVie's claims against him under the arbitration agreement he signed with PCYC.  (*See generally* Lee Mot.)  "Generally, in deciding whether to compel arbitration, a court must determine two 'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute."  *Brennan* 796 F.3d at 1130 (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)).  Dr. Lee "bears the burden of showing each of these elements by a preponderance of the evidence."  *See Hansen v. Rock Holdings, Inc.*, 434 F. Supp. 3d 818, 824 (E.D. Cal. 2020) (citing *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 60 (2014); *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015); *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014)), *rev'd on other grounds*, 1 F.4th 667 (9th Cir. 2021).

AbbVie challenges only the first prong, arguing that Dr. Lee cannot enforce the arbitration agreement against it as a non-signatory.  (*See generally* Opp'n at 9–19.)  As Judge Benitez previously noted, (*see* Prior Order at 5 (citing *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006)), "[u]nder California law, a party seeking to compel arbitration against a non-signatory to the agreement must show that one of the following exceptions applies: (1) incorporation by reference; (2) assumption; (3) agency; (4) piercing the corporate veil or alter ego; (5) estoppel; and (6) third party beneficiary."  Dr. Lee argues that his claims should be compelled to arbitration because (1) the Arbitration Clause expressly applies to AbbVie, (*see* Lee Mot. at 10); (2) AbbVie provided PCYC ostensible agency to bind AbbVie, (*see id.* at 10–13); and (3) AbbVie is a third-party beneficiary of the Arbitration Agreement, (*see* Lee Mot. at 13–19).

### A.  *Plain Language*

In support of its argument that the plain language of the Arbitration Agreement encompasses claims between Dr. Lee and AbbVie, Dr. Lee relies on the Arbitration Clause: "Employee and Employer agree that . . . any . . . future claim (except a claim that by law is non-arbitrable) that has arisen or arises between . . . []Employee Parties[], and . . .

23-CV-2290 TWR (DEB)

[]*Employer Parties*[] . . . shall be resolved by final and binding arbitration," (*see* Arb. Agrmt. § I (emphasis added)), because "Employer Parties" is defined to include PCYC and "its past, present, and future: parent(s)," (*see id.*), namely, AbbVie. (*See* Lee Mot. at 10.) AbbVie, on the other hand, relies on the following Covenant Not to Sue, which provides that "Employee hereby covenants not to file a lawsuit against Employer Parties and Employer hereby covenants not to file a lawsuit against Employee Parties," (*see* Arb. Agrmt. § I), noting that it was only PCYC—and not "Employer Parties"—who covenanted not to sue Dr. Lee. (*See* Opp'n at 9–10.)  At the hearing, AbbVie also argued that the Arbitration Clause was explicitly an agreement between "Employee and Employer," *i.e.*, Dr. Lee and PCYC, not AbbVie. (*See* Tr. at 13:7–20.)

Although the Arbitration Clause encompasses claims arising out of disputes between Dr. Lee and "Employer Parties," including AbbVie, the Arbitration Agreement itself is explicitly entered into only between "Employee and Employer," *i.e.*, Dr. Lee and PCYC. Accordingly, the Arbitration Clause Dr. Lee invokes would likely be definitive of the second "gateway" inquiry the court must make, namely, whether the Arbitration Agreement covers the instant dispute, but Dr. Lee still must demonstrate that he is entitled to enforce the Arbitration Agreement against AbbVie, which remains a non-party and non-signatory to the Arbitration Agreement.

### B.  Ostensible Agency

Dr. Lee next argues that "AbbVie provide[d] the employee who sent Dr. Lee the Arbitration Agreement ostensible authority to bind AbbVie to the Arbitration Agreement[.]" (*See* Lee Mot. at 10.)  "Courts look to traditional principles of contract and agency law to determine whether a nonsignatory is bound by an arbitration agreement signed by its principal or agent."  *Cohen v. TNP 2008 Participating Notes Program, LLC*, 31 Cal. App. 5th 840, 860 (2019).  Under California law, "[a]n agency is either actual or ostensible."  Cal. Civ. Code § 2298.  "An agency is ostensible when the principal intentionally, or by want of care, causes a third person to believe another to be his agent who is not really employed by him."  Cal. Civ. Code § 2300; *see also* Cal Civ. Code § 2317

10

("Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess."). "A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof." Cal. Civ. Code § 2334.

"An agent's authority may be implied from the circumstances of a particular case and may be proved by circumstantial evidence." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 479–80 (9th Cir. 2000) (citing *Kelley v. R.F. Jones Co.*, 272 Cal. App. 2d 113, 120 (1969)). "While it is true that the ostensible authority of an agent cannot be based solely upon the agent's conduct, it is not true that the principal must make explicit representations regarding the agent's authority to the third party before ostensible authority can be found." *Id.* at 480 (citing *Kaplan v. Coldwell Banker Residential Affiliates, Inc.*, 59 Cal. App. 4th 741, 747 (1997)). "For example, ostensible authority may be proven through evidence of the principal transacting business solely through the agent, the principal knowing that the agent holds himself out as clothed with certain authority but remaining silent, the principal's representations to the public in general, and the customs and usages of the particular trade in question." *Id.* (first citing *Kelley*, 272 Cal. App. 2d at 120; then citing *Am. Cas. Co. v. Krieger*, 181 F.3d 1113, 1121 (9th Cir. 1999); then citing *Kaplan*, 59 Cal. App. 4th at 747; then citing *Correa v. Quality Motor Co.*, 118 Cal. App. 2d 246, 251 (1953); *Auto Auction, Inc. v. Riding Motors*, 187 Cal. App. 2d 693, 696–97 (1960)).

Judge Benitez rejected Dr. Lee's prior argument regarding agency based on the fact that PCYC is a subsidiary of AbbVie, concluding that Dr. Lee had not introduced "facts demonstrat[ing] Plaintiff exercised such a degree of control over PCYC that PCYC is 'a mere instrumentality' of Plaintiff." (*See* Prior Order at 8.) Although Judge Benitez did not explicitly address Dr. Lee's *ostensible* agency argument in his Prior Order, (*see generally* Prior Order; *see also* Lee Mot. at 12 n.5; Lee Opp'n at 13; Lee Reply at 9), Judge Benitez's "refusal to discuss an argument constitutes an implicit rejection of those arguments," *see Roy v. Cnty. of Los Angeles*, No. CV1209012ABFFMX, 2018 WL 3439168, at *4 (C.D.

Cal. July 11, 2018) (citing *Clemons v. Mississippi*, 494 U.S. 738, 747 n.3 (1990); *Savage v. Hadlock*, 296 F.2d 417, 419 (D.C. Cir. 1961))  While "*[a]ll rulings of a trial court are subject to revision at any time before the entry of judgment*," *United States v. Smith*, 389 F.3d 944, 949 (9th Cir. 2004) (emphasis in original) (quoting *City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 888 (9th Cir. 2001)), the Court is mindful of the Ninth Circuit's recent admonition that "judges who sit in the same court should not attempt to overrule the decisions of each other."  *See Zeyen v. Bonneville Jt. Dist. # 93*, 114 F.4th 1129, 1138 (9th Cir. 2024) (quoting *Castner v. First Nat'l Bank of Anchorage*, 278 F.2d 376, 379 (9th Cir. 1960)).  Indeed, the Ninth Circuit recently clarified that "[a] second district judge should not reconsider the ruling of a predecessor unless: '(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial.'"  *Id.* at 1138 (quoting *Delta Sav. Bank v. United States*, 265 F.3d 1017, 1027 (9th Cir. 2001)).

That said, the Court recognizes that Judge Benitez explicitly denied Dr. Lee's prior motion "without prejudice," (*see* Prior Order at 8, 13), and defense counsel represented at oral argument that they would have filed a second motion to compel arbitration whether or not the case had been reassigned.  (*See* Tr. at 11:20–22.)  Although Dr. Lee relies in the instant second attempt to compel AbbVie to arbitration on much of the same evidence that he introduced in his prior reply, (*compare* ECF Nos. 24-1–15, *with* ECF Nos. 32-1–26), he has included some additional evidence, including several press releases, (*see* ECF Nos. 33-2 ("Ex. 1"), 33-3 ("Ex. 2"), 33-4 ("Ex. 3")); AbbVie's 2018 Responsible Action Report, (*see* ECF No. 33-19 ("Ex. 17")); and AbbVie's Form 10-Q dated August 7, 2018, (*see* ECF No. 33-20 ("Ex. 18")).  The Court concludes, however, that only two of these new exhibits are relevant to what Dr. Lee reasonably believed when he signed the Arbitration Agreement on October 29, 2018.  (*Compare* Ex. 13 at 5, *with* Exs. 1–3, 17, 18); *see also Pereda v. Atos Jiu Jitsu LLC*, 85 Cal. App. 5th 759, 771 (2022) ("Because ostensible agency focuses on what a reasonable person knowing what plaintiff knew would have

believed, we necessarily focus on what plaintiff knew *at the time of [signing the arbitration agreement]*." (emphasis in original) (citing *A.C. Label Co. v. Transam. Ins. Co.*, 48 Cal. App. 4th 1188, 1194 (1996))).  The first, a press release dated May 16, 2015—more than three years before Dr. Lee even began exploring his transfer to PCYC—heralds AbbVie's acquisition of PCYC, boasting that, "[t]ogether with its wholly-owned subsidiary, Pharmacyclics, AbbVie employs more than 28,000 people worldwide and markets medicines in more than 170 countries."  (*See* Ex. 1 at 2.)  The second, dated December 11, 2017, is a press release from "Pharmacyclics, An AbbVie Company" regarding clinical results from a trial of its drug IMBRUVICA®.  (*See generally* Ex. 3.)  Admittedly, despite appearing on PCYC's website, the December 2017 press release reads in many ways as though it were an AbbVie press release, opening "AbbVie (NYSE: ABBV), a global biopharmaceutical company, today announced new data on the biologic and cellular mechanisms of IMBRUVICA® (ibrutinib)," (*see id.* at 1), and providing information "About AbbVie" but not PCYC,  (*see id.* at 4).  Even accepting that Dr. Lee reviewed these press releases and was aware at the time he was presented with the Arbitration Agreement that AbbVie included PCYC employees in its headcount and had issued a press release concerning one of the drugs developed by PCYC, however, these representations by AbbVie could not give rise to a "reasonable" belief that AbbVie had authorized PCYC to bind it to arbitration.

Dr. Lee's previously submitted exhibits also fail to establish that PCYC was acting as AbbVie's ostensible agent when it presented the Arbitration Agreement to Dr. Lee.  It is clear that Dr. Lee received several documents throughout the "transfer" process that prominently displayed the name AbbVie, including an "AbbVie Relocation Handbook," (*see* ECF Nos. 33-8 ("Ex. 7"), 33-13 ("Ex. 12")), and "AbbVie Total Rewards Highlights: An Overview of benefits, compensation and well-being resources for employees of Pharmacyclics, an AbbVie company."  (*See* ECF No. 33-10 ("Ex. 9").)  Dr. Lee also attests that he "remember[s] looking up the online presence of Mr. Richter and also Ms. Lavanya Dinesh Kumar, a copy on th[e] email[s he exchanged during the transfer process], and

understanding them to be both AbbVie employees working at PCYC." (Lee Decl. ¶ 13.) All of the individuals with whom Dr. Lee corresponded, however, had "@pcyc.com" email addresses, (*see generally* Exs. 4, 5), and Dr. Lee fails to indicate what sources he viewed led him to understand that they were "AbbVie employees working at PCYC." (*See generally* Lee Decl.) Even assuming that Dr. Lee assessed the employees' "online presence" through their LinkedIn profiles,[2] ostensible authority cannot be based solely on *PCYC's* conduct. *See C.A.R. Transp. Brokerage*, 213 F.3d at 480.

Rather, the burden is on Dr. Lee to prove that *AbbVie* took some action that would lead him reasonably to believe that PCYC had the authority to bind AbbVie to arbitration. *See, e.g.*, *Knapke v. PeopleConnect, Inc.*, 38 F.4th 824, 832 (9th Cir. 2022) ("[T]he party seeking to compel arbitration[] must prove the existence of a valid agreement by a preponderance of the evidence." (citing *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1219 (9th Cir. 2019))); *Rogers v. Roseville SH, LLC*, 75 Cal. App. 5th 1065, 1074–75 (2022) ("The burden of proving that a purported agent had the authority to act for the purported principal in a particular circumstance lies with the persons dealing with the agent."); *see also Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006) (noting "the liberal federal policy regarding the scope of arbitrable issues is inapposite" where, as here, "[t]he question . . . is not whether a particular issue is arbitrable, but whether a particular *party* is bound by the arbitration agreement" (emphasis in original) (citing *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002))); *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991) ("The district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made between the parties, should give to the opposing party the benefit of all

---

[2] The LinkedIn profiles are only relevant if they were viewed by Dr. Lee before he signed the Arbitration Agreement. *See Pereda*, 85 Cal. App. 5th at 771. Not only does Dr. Lee not attest that he viewed the LinkedIn profiles, (*see generally* Lee Decl.), which are instead introduced through a declaration from counsel, (*see* ECF No. 33-17 ("Elihu Decl.") ¶¶ 3, 6–11), but there is no indication that the September 9, 2024 versions of the LinkedIn profiles fairly represent what was displayed six years earlier when Dr. Lee would have viewed them.

23-CV-2290 TWR (DEB)

reasonable doubts and inferences that may arise."). Here, the only relevant information from AbbVie that Dr. Lee has identified are the two press releases discussed above, *see supra* page 13, which are insufficient to cause Dr. Lee to reasonably believe that PCYC had ostensible authority to bind AbbVie to arbitration. *See, e.g.*, *Pereda*, 85 Cal. App. 5th at 771–73 (affirming that injured student's belief that national jiujitsu association had control over local affiliate studio's sparring activities based on affiliate's display of association's banner in its studio and association's listing of affiliate on its website was not reasonable as a matter of law); *Hughes v. Farmers Ins. Exch.*, 107 Cal. App. 5th 73, *as modified* (Dec. 3, 2024) (affirming summary adjudication of claim brought by homeowner against national insurance company based on fire loss because homeowner's belief that broker was acting as national insurance company's agent in procuring fire loss plan under California FAIR Plan based on use of national insurance company's logo in communications and endorsement was not reasonable as a matter of law); *see also Markow v. Rosner*, 3 Cal. App. 5th 1027, 1045 (2016) ("[W]hether [the plaintiff]'s purported conclusion that [the defendant doctor] was [the defendant hospital]'s agent was reasonable . . . is a question of law.").

### C.    Third-Party Beneficiary

Finally, Dr. Lee contends that AbbVie is bound by the Arbitration Agreement as a third-party beneficiary. (*See* Lee Mot. at 13–15.) "A third[-]party beneficiary is someone who may enforce a contract because the contract is made expressly for his benefit." *Pillar Project AG v. Payward Ventures, Inc.*, 64 Cal. App. 5th 671, 677 (2021) (internal quotation marks omitted) (quoting *Jensen v. U-Haul Co. of Cal.*, 18 Cal. App. 5th 295, 301 (2017)). "The test for determining whether a contract was made for the benefit of a third person is whether an intent to benefit a third person appears from the terms of the contract." *Id.* (internal quotation marks omitted) (quoting *Jensen*, 18 Cal. App. 5th at 301). "[T]he mere fact that a contract results in benefits to a third party does not render that party a "third party beneficiary." *Id.* (alteration in original & internal quotation marks omitted) (quoting *Jensen*, 18 Cal. App. 5th at 302).

Judge Benitez denied Dr. Lee's prior motion on the grounds that "[t]he Court cannot conclude that Plaintiff's arguable inclusion in the definition of the term 'Employer Parties' is sufficient to show the Arbitration Agreement was made expressly for Plaintiff's benefit." (*See* Prior Order at 6.)  Ultimately, Dr. Lee introduces no new evidence or arguments that would merit revisiting Judge Benitez's denial of Dr. Lee's prior request on this ground.

## III.    Conclusion

In light of the foregoing, the Court concludes that Dr. Lee has failed to demonstrate that there exists a valid arbitration agreement that binds AbbVie.  Accordingly, the Court **DENIES** Dr. Lee's Motion to the extent it seeks to compel AbbVie to arbitration.

### MOTIONS TO STAY

Because the Court **DENIES** Dr. Lee's Motion to compel AbbVie to arbitration, *see supra*, the Court also **DENIES AS MOOT** Dr. Lee's and Adcentrx's Motions to the extent they request that the Court stay this action pending arbitration of AbbVie's claims against Dr. Lee.  (*See* Lee Mot. at 16–17; Adcentrx Mot. at 3–6.)

### MOTIONS TO DISMISS

Alternatively, both Dr. Lee and Adcentrx seek to dismiss with prejudice AbbVie's First Amended Complaint in its entirety.  (*See generally* Lee Mot. at 17–25; Adcentrx Mot. at 6–15.)

## I.    Standard of Review

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).  "A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'"  *Id.* at 1242 (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

/ / /

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'— 'that the pleader is entitled to relief.'" *Id.* at 679 (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

"If a complaint is dismissed for failure to state a claim, leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)). "A district court does not err in denying leave to amend where the amendment would be futile." *Id.* (citing *Reddy v. Litton Indus.*, 912 F.2d 291, 296 (9th Cir. 1990), *cert. denied*, 502 U.S. 921 (1991)).

## II. Analysis

Because both Dr. Lee and Adcentrx seek to dismiss AbbVie's First Amended Complaint in its entirety, (*see generally* Lee Mot. at 17–25; Adcentrx Mot. at 6–15), the Court addresses each of AbbVie's four causes of action in turn.

### A.  First Cause of Action: Misappropriation of Trade Secrets

AbbVie's first cause of action is for misappropriation of trade secrets under the DTSA against Adcentrx and Dr. Lee.  (FAC ¶¶ 164–89.)  "To state a claim for misappropriation of trade secrets, a plaintiff must allege: (1) existence and ownership of a trade secret; (2) misappropriation thereof; and (3) damages."  (Prior Order at 9 (citing *AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1144 (N.D. Cal. 2019)).  Judge Benitez previously determined that AbbVie had failed to state a claim under both the first and second prongs, (*see generally id.* at 9–12), and Defendants again move to dismiss on these same grounds.  (*See generally* Adcentrx Mot. at 6–14; Lee Mot. at 17–24.)

#### 1.  Existence of Trade Secrets

Under the DTSA, "[a] 'trade secret' has three elements: (1) it must be the right type of information (*i.e.*, financial, scientific, technical, etc.); (2) the owner has taken reasonable measures to keep secret; and (3) the information derives independent economic value from its secrecy."  (Prior Order at 9 (citing 18 U.S.C. § 1839(3); *Kimera Labs Inc. v Jayashankar*, No. 21-cv-2137-MMA-DDL, 2022 WL 11965058 at *7 (S.D. Cal. Oct. 20, 2022)).)  In its First Amended Complaint, AbbVie identifies several specific categories of trade secrets—the "Payload Trade Secrets," (*see* FAC ¶¶ 44–51); the "Linker-Drug Design Trade Secrets," (*see id.* ¶¶ 52–58); the "ADC Trade Secrets," (*see id.* ¶¶ 59–62); and the "Methods and Scientific Information Trade Secrets," (*see id.* ¶¶ 62–65)—each of which Defendants contend are insufficiently pleaded.  (*See* Adcentrx Mot. at 7–12; Lee Mot. at 17–22.)

#### a.  AbbVie's Payload Trade Secrets

AbbVie defines its "Payload Trade Secrets" as DLJ-43 (also referred to as ABBV-1), which Dr. Lee synthesized on November 8, 2016, and DLJ-51, which Dr. Lee synthesized no later than January 4, 2017.  (*See* FAC ¶¶ 48, 49.)  Defendants argue that AbbVie fails adequately to allege that these compounds were kept secret and had

/ / /

/ / /

independent economic value.[3]  (*See* Adcentrx Mot. at 7–12; Lee Mot. at 18–19.)  AbbVie responds that it "repeatedly pled that *all* of its trade secrets were unknown to anyone without a secrecy obligation to AbbVie prior to Lee's and Adcentrx's misappropriation," (*see* Opp'n at 26 (citing FAC ¶¶ 43, 51, 55, 57, 61, 64)), and that "the FAC details the economic value of the trade secrets to a biopharmaceutical company, the efforts AbbVie takes to maintain their secrecy, and the value Adcentrx placed on them by using them in its competing clinical drug program.  (*See id.* at 28 (citing FAC ¶¶ 66–93).)

The Court concludes that AbbVie's allegations that it "maintained the secrecy of its proprietary MTi ADC payload designs, including but not limited to DJL-43 and DJL-51," (*see* FAC ¶ 51), are sufficient.  Among other things, AbbVie alleges that it designated documents concerning its Payload Trade Secrets confidential, (*see* FAC ¶ 51); allowed access to such documents only through "computer controls, limitations on data access, IT disaster recovery, network security, user setup procedures, password administration and management, data backup, security audits, security breach investigations, and mobile device security," (*see id.* ¶ 82; *see also id.* ¶¶ 83–86); and required third parties to sign nondisclosure agreements, (*see id.* ¶ 89), and employees sign confidentiality agreements. (*See id.* ¶ 90.)

As for whether AbbVie sufficiently alleges that the Payload Trade Secrets have independent economic value, as AbbVie notes, (*see* Opp'n at 27), "[t]he standard to show that trade secrets derive economic value is not a high standard."  *See Calendar Rsch. LLC v. StubHub, Inc.*, No. 2:17-CV-04062-SVW-SS, 2017 WL 10378336, at *4 (C.D. Cal. Aug. 16, 2017).  AbbVie alleges, among other things, that it "spent at least five years and many millions of dollars developing its MTi ADC technology," (*see* FAC ¶ 72), and that "[t]he worldwide market for ADCs generates billions of dollars in revenue annually, and it

---

[3]    To the extent Defendants argue in their Reply that the Payload Trade Secrets are insufficiently pleaded, (*see* Reply at 13), this argument is untimely, and the Court concludes that AbbVie's allegations in the First Amended Complaint are sufficiently detailed.

is growing." (*See id.* ¶ 74.)  Indeed, "the ADC market is highly competitive and projected to grow from $9.7 billion in 2023 to $10.9 billion by 2028," meaning "AbbVie's trade secrets are valuable innovations in this market that could potentially generate significant revenue in commercialization." (*See id.* ¶ 75.)  Consequently, AbbVie's trade secrets "have independent economic value from not being generally known to others who can obtain economic value from the unconsented disclosure or use of the information and who could use such information to save significant time and resources in developing ADCs to compete against AbbVie in the market." (*See id.* ¶ 72.)  The Court concludes that these allegations suffice to allow the Parties to proceed to discovery.

### b.    AbbVie's Linker-Drug Design Trade Secrets

AbbVie alleges that its "Linker-Drug Design Trade Secrets" "include novel designs and structural formulas for linker-drugs that Lee designed and synthesized while at AbbVie," (*see* FAC ¶ 52), which are comprised of a C-terminal conjugation, dipeptide linker devoid of a p-aminobenzyloxycarbamate ("PABC") spacer, and stable antibody attachment group.  (*See id.* ¶ 53.)  As with Payload Trade Secrets, *see supra* Section II.A.1.a, Defendants contend that AbbVie "fails to allege the linker-drug was still generally unknown at the time of the alleged misappropriation or has any independent economic value." (*See* Adcentrx Mot. at 9–10; Lee Mot. at 19–20.)  For the same reasons the Court concludes that AbbVie adequately alleges that the Payload Trade Secrets were kept secret and had independent economic value, *see supra* Section II.A.1.a, the Court concludes that AbbVie adequately alleges the Linker-Drug Design Trade Secrets.

### c.    AbbVie's ADC Trade Secrets

AbbVie alleges that its trade secrets include "designs for antibody-drug conjugates (ADCs) incorporating AbbVie's proprietary payloads and linker-drugs," (*see* FAC ¶ 59), which "comprise: (1) an antibody conjugated (attached) to an MTi linker-drug through a stable antibody attachment; having (2) a Drug Antibody Ratio ("DAR") of 8; and (3) possessing hydrophilic shifts compared to the generally known SeaGen's MMAE ADC." (*See id.* ¶ 60.)  In addition to arguing that AbbVie fails adequately to allege that

the ADC Trade Secrets were kept secret and derived independent economic value, (*see* Adcentrx Mot. at 11; Lee Mot. at 21), Defendants argue that the "broad, categorical language" used to describe the ADC Trade Secrets is too vague to allege a trade secret. (*See* Adcentrx Mot. at 10–11; Lee Mot. at 20–21.)  Specifically, Defendants fault AbbVie for failing to "describ[e] of what the [stable antibody attachment] actually consists," include "specific information on how to achieve . . . a [DAR of 8] or what it encompasses," and "describ[e] *what specific* 'hydrophilic shifts' . . . are its trade secrets."  (*See* Adcentrx Mot. at 11 (emphasis in original); Lee Mot. at 21 (emphasis in original).)

Claims under the DTSA are not subject to a heightened pleading standard.  *See, e.g.*, *Cedars Sinai Med. Ctr. v. Quest Diagnostic Inc.*, No. CV 17-5169-GW(FFMX), 2018 WL 2558385, at *3–4 (C.D. Cal. Feb. 12, 2018); *see also Coldwell Solar, Inc. v. ACIP Energy LLC*, No. 220CV00768TLNCKD, 2021 WL 3857981, at *11 (E.D. Cal. Aug. 30, 2021) ("[T]here is no heightened standard of pleading in claims for misappropriation of trade secrets." (alteration in original) (quoting *Hirel Connectors, Inc. v. United States*, No. CV 01-11069 DSF (VBKx), 2004 WL 5639770, at *22 (C.D. Cal. Jan 23, 2004))).  Indeed, "[c]ase law indicates that the level of detail required in trade secret pleadings is not high." *Cedars Sinai Med. Ctr.*, 2018 WL 2558385, at *5.  All that is required is that AbbVie provide "enough detail for [Defendants] 'to prepare a defense and for the court to craft limits on discovery.'"  *Id.* at *6 (quoting *Gatan, Inc. v. Nion Co.*, No. 15-cv-01862=PJH, 2017 WL 1196819, at *6 (N.D. Cal. Mar. 31, 2017)).  Although it is understandable that Defendants would desire additional detail, the Court concludes that AbbVie's allegations suffice to meet the requisite standard.  Additionally, for the same reasons discussed above, *see supra* Sections II.A.1.a–b, the Court concludes that AbbVie sufficiently alleges that the ADC Trade Secrets were kept secret and derived independent economic value.

> d.    AbbVie's Methods and Scientific Information Trade Secrets

Finally, AbbVie alleges that it developed certain Methods and Scientific Information Trade Secrets, including "[m]ethods for synthesizing AbbVie's designs for AbbVie proprietary MTi ADC payloads (such as DJL-43, DJL-51), linkers, linker-drugs, and ADCs

incorporating the same" ("Design Synthesis Methods"); "[m]ethods (assays) for testing key chemical and biological properties of AbbVie proprietary MTi ADC payloads, linkers, linker-drugs, and ADCs" ("Design and Structural Formula Testing Methods"); and "[s]cientific information and data regarding chemical and biological properties of its payloads, linkers, linker-drugs, and ADCs," including "information about efficacy, therapeutic index, potency, free drug levels, bystander activity, hydrophilicity, drug-antibody ratio ("DAR"), stability and tolerability of various MTi ADC designs and structural formulas, such as ABBV-1 and ABBV-2, and the associated linker-drug and antibody-drug conjugate designs that were synthesized in the MTi ADC program." (*See* FAC ¶ 63.) As with the ADC Trade Secrets, Defendants contend that these allegations "could not be more vague or implausible," (*see* Adcentrx Mot. at 11–12; Lee Mot. at 21–22), and that AbbVie fails to allege secrecy or independent economic value. (*See* Adcentrx Mot. at 12; Lee Mot. at 22.) Specifically, "there is not a single description of *what* the alleged trade secret methods are, *what specific* 'payloads, linkers, linker-drugs, and ADCs' AbbVie claims are its trade secrets, or to *what* 'scientific information and data' it is attempting to refer." (*See* Adcentrx Mot. at 11–12 (emphasis in original); Lee Mot. at 22 (emphasis in original).)

Although a closer question, AbbVie's final category of trade secrets is sufficiently tethered to the first three categories of trade secrets such that AbbVie's allegations suffice to put Defendants on notice. In *Alta Devices, Inc. v. LG Elecs., Inc.*, for example, the Honorable Lucy H. Koh concluded that the plaintiff had identified "the exact technology in question: thin-film GaAs solar technology," and adequately had alleged "Methods of: high throughput thin-film deposition; epitaxial lift-off of the thin-film; and GaAs substrate maintenance and re-use," as well as "proofs and tests of manufacturing concepts and techniques; tool roadmaps; manufacturing process flows; and identification of equipment and equipment vendors; and information related to the foregoing." *See* 343 F. Supp. 3d 868, 881 (N.D. Cal. 2018); *see also, e.g., Cedars Sinai Med. Ctr.*, 2018 WL 2558385, at *6 (concluding that the plaintiff had "adequately identified its trade secrets" where it

"describe[d] its trade secrets as 'financial, business, scientific, technical, economic, and/or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, tangible and/or intangible, related to IBS diagnostic techniques and validation of the same, as well as how to serve unmet clinical needs associated with IBS'"). Accordingly, for the same reasons discussed above, *see supra* Sections II.A.1.a–c, the Court concludes that AbbVie has identified its Methods and Scientific Information Trade Secrets with sufficient particularity and that those trade secrets have been kept confidential and have derived independent economic value from that secrecy.

### 2. Misappropriation

For purposes of the DTSA, "[m]isappropriation is defined as improper: (1) acquisition; (2) disclosure; or (3) use of a trade secret," (Prior Order at 9 (citing *Kimera Labs*, 2022 WL 11965058 at *6)), and "[i]mproper is further defined as 'theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.'" (*Id.* (quoting *Physician's Surrogacy, Inc. v. German*, No. 17cv718-MMA (WVG), 2018 WL 638229 at *4 n.3 (S.D. Cal. Jan. 31, 2018)).) Defendants also argue for dismissal of AbbVie's DTSA cause of action on the grounds that, "[l]ike the deficient initial complaint, the FAC provides no detail about to what, specifically, Dr. Lee is claim[ed] to have had access, and wh[at], if anything, AbbVie claims he took with him when he left his employment with AbbVie/PCYC." (*See* Adcentrx Mot. at 12; Lee Mot. at 23.) Adcentrx also contends that "the FAC is devoid of any allegations specifically directed at alleged misappropriation by Adcentrx." (*See* Adcentrx Mot. at 13.)

As AbbVie notes, (*see* Opp'n at 32), "trade secrets can exist in employees' memories; a trade-secret plaintiff does not need to show that an actual document was taken." *See Wisk Aero LLC v. Archer Aviation Inc.*, No. 3:21-CV-02450-WHO, 2021 WL 8820180, at *24 (N.D. Cal. Aug. 24, 2021). Here, AbbVie alleges that, "[f]ollowing his employment with AbbVie, Lee took, used, and disclosed AbbVie's trade secrets and

confidential information without authorization, in connection with his work for Adcentrx," (*see* FAC ¶ 94), and that "Adcentrx itself then used and disclosed AbbVie's trade secrets and confidential information, including by creating an MTi ADC program for itself based on AbbVie's trade secrets and confidential information, and prepared patent applications and other publications (e.g., investor presentations) that disclose AbbVie trade secret and confidential information." (*See id.* ¶ 95.) Specifically, for example, "the very same two payload designs Lee described in AbbVie documents during his AbbVie employment as 'novel'—ABBV-1 and ABBV-2 (then known as DJL-43 and DJL-51)—are exactly replicated in Adcentrx patent applications naming Lee as an inventor," (*see id.* ¶ 96), that was submitted on "an impossibly fast timeframe for independent invention of the subject matter." (*See id.* ¶ 102.) Dr. Lee's and Adcentrx's acquisition, disclosure, and use of these trade secrets was "improper" given, among other things, Dr. Lee's continuing contractual obligation under his Employment Agreement with AbbVie to protect the secrecy and confidentiality of AbbVie's confidential information. (*See, e.g., id.* ¶ 154.) The Court concludes that these allegations suffice to state a claim for trade secret misappropriation against both Dr. Lee and Adcentrx. *See, e.g., Wisk Aero LLC v. Archer Aviation Inc.*, No. 3:21-CV-02450-WHO, 2021 WL 8820180, at *15 (N.D. Cal. Aug. 24, 2021) ("At the very least, the allegedly implausible development timeline concurrent with the influx of former [plaintiff] employees reasonably implies that [defendant company] 'had reason to know' that the [competitor project] was improperly derived in part from [the plaintiff]'s trade secrets" (citing 18 U.S.C. § 1839(5)(A); Cal. Civ. Code § 3426.1(b)(1); *Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69, 79 (N.D. Cal. 2020))). Accordingly, the Court **DENIES** Defendants' Motions to dismiss AbbVie's first cause of action.

### B.    *Second Cause of Action: Declaratory Relief*

AbbVie also asserts a cause of action against Adcentrx and Dr. Lee under the Declaratory Judgment Act, 28 U.S.C. § 2201, (*see* FAC ¶¶ 190–99), seeking two declarations, namely, that "AbbVie possesses the right to prosecute the Disputed

/ / /

Applications, and all related . . . patents, applications, continuations, divisionals, continuations-in-part, and thereto," (*see id.* at Prayer ¶ 6), and that

> AbbVie possesses legal or equitable ownership and interest in the Disputed Applications, and all related patents, patent applications, continuations, and derivatives thereto, inconsistent and superior to any interest asserted by Defendants, including, but not limited to, PCT/US2022/048735; PCT/US2022/048739; PCT/US2022/053738; U.S. Provisional Application Serial Nos. 63/275,177; 63/275,403; 63/293,583; and 63/295,476; and that any license to any of these rights purportedly granted by Adcentrx, Lee, or anyone affiliated with them is null and void *ab initio*.

(*See id.* at Prayer ¶ 4.)  Defendants' only argument for dismissal of AbbVie's second cause of action is that it is dependent on AbbVie's first cause of action.  (*See* Adcentrx Mot. at 14–15; Lee Mot. at 24.)  Because the Court concludes that AbbVie's plausibly alleges that Defendants misappropriated its trade secrets, *see supra* Section II.A, the Court **DENIES** Defendants' Motions to Dismiss AbbVie's dependent second cause of action.

### C.    Third and Fourth Causes of Action: Breach of Contract

AbbVie's third and fourth causes of action for breach of contract are asserted only against Dr. Lee and relate to his alleged breach of the Inventions Assignment Provisions, (*see* FAC ¶¶ 200–10), and Confidentiality Provisions, (*see id.* ¶¶ 211–23), of his Employment Agreement with AbbVie.  As with AbbVie's second cause of action, Dr. Lee contends that AbbVie's third and fourth causes of action must be dismissed because they are "both . . . based on [Dr. Lee's] alleged trade secret misappropriation."  (*See* Lee Mot. at 24–25.)  Because the Court concludes that AbbVie's plausibly alleges that Dr. Lee misappropriated its trade secrets, *see supra* Section II.A, the Court also **DENIES** Dr. Lee's Motion to Dismiss AbbVie's third and fourth causes of action.

## III.    Conclusion

For the foregoing reasons, the Court **DENIES** Adcentrx's and Dr. Lee's Motions to Dismiss.

/ / /

/ / /

## CONCLUSION

In light of the foregoing, the Court **DENIES** Adcentrx's and Dr. Lee's Motions (ECF Nos. 32 and 33, respectively).  Specifically, the Court **DENIES** Dr. Lee's Motion to compel AbbVie to arbitration, **DENIES AS MOOT** Adcentrx's and Dr. Lee's requests to stay this action pending arbitration of AbbVie's claims against Dr. Lee, and **DENIES** Adcentrx's and Dr. Lee's Motions to Dismiss.  Accordingly, Defendants **SHALL ANSWER** AbbVie's First Amended Complaint in accordance with Federal Rule of Civil Procedure 12(a)(4)(A).

**IT IS SO ORDERED.**

Dated:  February 6, 2025

_____

Honorable Todd W. Robinson
United States District Judge